IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JAMES WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:12-CV-892-WKW |
| | ) | [WO] |
| JANARIUS JACKSON, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Before the court is Defendant Janarius Jackson's motion for summary judgment on Plaintiff James Williams's Eighth Amendment deliberate indifference claim. (Doc. # 38.) The motion has been fully briefed. (Docs. # 41, 42.) Upon consideration of the parties' arguments, the evidence, and the relevant law, the court finds that Mr. Jackson's motion is due to be granted in part and denied in part.

## I. JURISDICTION AND VENUE

Subject matter jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 & 1343. Personal jurisdiction and venue are uncontested.

## II. STANDARD OF REVIEW

To succeed on summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and [he] is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence and the inferences from that evidence in the light most favorable to the nonmovant. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact. *Id.*; Fed. R. Civ. P. 56(c)(1)(A). Or, the movant can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. Fed. R. Civ. P. 56(c)(1)(B). If the movant meets its burden, the burden shifts to the nonmoving party to establish – with evidence beyond the pleadings – that a genuine dispute material to each of its claims for relief exists. *Celotex*, 477 U.S. at 324. A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

### III. BACKGROUND

**A.    Facts**

Mr. Williams is a Department of Corrections ("DOC") inmate at Ventress Correctional Facility. Mr. Jackson works as a correctional officer at Ventress. On

July 16, 2012, Mr. Williams sustained a non-life threatening injury during an altercation with another inmate, DeAndre Bell. Mr. Williams claims the injury could have been much more serious because Mr. Bell had a weapon. Mr. Williams asserts that Mr. Jackson watched the fight with adequate time to intervene and defuse the situation. The following facts are taken from the complaint and the record evidence which includes the parties' sworn testimony and the DOC's incident reports and investigation.

Mr. Williams alleges that Mr. Jackson is the officer who permitted him to leave his dorm, C-1, to enter Mr. Bell's dorm, C-4. (Compl. at ¶ 4.)[1] Mr. Jackson denies any responsibility for allowing Mr. Williams out of his dorm. (*See* Jackson Aff. at 2 (Doc. # 38-1).)[2] DOC's investigation into the incident revealed that Mr. Williams wanted to confront Mr. Bell about a missing package that allegedly contained a cell phone and "dope." (*See* Duty Officer Report (Doc. # 38-2 at 4); ODC Investigative Report (Doc. # 38-3, at 2) ("Inmate Williams stated that he went to talk to [Mr. Bell] about some stolen property of a fellow inmate.").) While the complaint alleges that Mr. Bell accosted Mr. Williams without provocation,

---

[1] (*But see* Williams Aff. at ¶2 (Doc. # 44) (claiming that Mr. Bell "was permitted to come over to [Mr. Williams's] area").) Regardless of whether Mr. Williams came to Mr. Bell or Mr. Bell came to Mr. Williams, the primary disputed fact in the case is whether Mr. Jackson watched an altercation involving a weapon without intervening.

[2] It is apparently not very difficult to move from C1 to C4. *See* Bell Statement (Doc. # 38-3, at 5) (describing the various sections of C dorm as being separated by a cube in the center of the dorm).)

3

(Compl. at ¶ 5), Mr. Bell reported that Mr. Williams, who is considerably larger than Mr. Bell, approached him demanding the return of property, (Bell Statement (Doc. # 38-3, at 4–5)). Mr. Williams acknowledged approaching Mr. Bell and asking about a missing phone when he spoke to a DOC investigator. (Williams Statement (Doc. # 38-3, at 10).)

When approached by Mr. Williams, Mr. Bell drew a weapon similar to what has been variously described as a hand-made knife, ice pick, or screwdriver, and swung it at Mr. Williams. Mr. Williams tried to force the weapon out of Mr. Bell's hand. During the fracas, Mr. Bell cut Mr. Williams's nose. He also "stabbed" Mr. Williams's upper body with the weapon "approximately 11 or 12 times", (Compl. at ¶ 5), but those wounds did not require stitches. Mr. Williams overturned benches and a table in an effort to trip Mr. Bell, and the two men eventually wound up in front of the dorm's bathroom, squared off in a fighting stance. When speaking with DOC officials investigating the incident, both Mr. Bell and Mr. Williams reported that the altercation ended at the moment that they observed a corrections officer. (*See* Bell Statement (Doc. # 38-3, at 6) ("[T]hen the police came, ended up coming to the door and you know I stopped cause he stopped coming at me."); Williams Statement (Doc. # 38-3, at 11–12) ("[I was] just trying to make him just come on with it, then at that point that's when the police was watching.").) Mr. Bell walked away from the scene, and his weapon was never

4

recovered. Mr. Williams approached Mr. Jackson and reported that he had been stabbed and needed medical attention.

Mr. Jackson emphasizes that he has testified consistently with Mr. Bell's and Mr. Williams's statements to the DOC Investigator that he first observed something amiss when he saw overturned benches in the C4 dorm while conducting a roving patrol. He did not observe the altercation. Rather, he saw the two men as they stood in front of the bathroom in the fighting stance. (Jackson Aff. (Doc. # 38-1, at 1).) Mr. Williams insists, however, that "while [he] was being stabbed repeatedly, [he] could see Officer Jackson just standing outside the room looking through the glass window and watching [Mr.] Bell hurt him." (Williams Aff. at ¶ 3 (Doc. # 44).) According to Mr. Williams, Mr. Jackson could have intervened before he was injured.

Once the fight stopped and Mr. Williams reported his injury to Mr. Jackson, Mr. Jackson took him to the health care unit where other personnel determined that Mr. Jackson required treatment at a hospital. Mr. Williams was transported to Troy Medical Center where he received stitches for a one-and-a-half inch cut to his nose. Mr. Williams alleges in his complaint that Mr. Bell "almost kill[ed]" him, and he "struggled to stay alive." (Compl. at ¶ 5.) Viewing the record evidence in the light most favorable to Mr. Williams, he could have been more seriously injured or killed, but his actual injuries were not life-threatening.

5

Mr. Williams declined to press charges against Mr. Bell and the two reportedly signed a "living agreement."[3] There is no evidence that Mr. Williams still considers Mr. Bell to be a threat to his safety.

**B.   Procedural History**

In October 2012, Mr. Williams filed his complaint naming Mr. Jackson and Warden J. C. Giles as defendants. Mr. Jackson was not properly served with process. Warden Giles moved for dismissal of the claims against him. The court granted the motion, finding that Warden Giles was immune from suit in his official capacity and that Mr. Williams failed to allege a plausible Eighth Amendment deliberate indifference claim against Warden Giles in his individual capacity. (*See* Doc. # 31.) Mr. Williams declined to amend his complaint with respect to Warden Giles. He then obtained leave from the court to serve Mr. Jackson with his complaint, even though service was untimely under Rule 4(m). (*See* Doc. # 34 (describing circumstances justifying the grant of an extension of time to serve Mr. Jackson).) After receiving service, Mr. Jackson responded to the complaint by filing the instant motion for summary judgment. (Doc. # 38.) Mr. Williams responded and alluded to evidence supporting his position. (Doc. # 41.) However,

---

[3] The term "living agreement" has not been defined, but it is presumably a statement signed by two or more inmates who have a history of conflict with one another in which they relieve the DOC of liabilities or damages and represent that they can live together in the prison population without violence. *See Martin v. Forniss*, 2:07-CV-335-MEF, 2009 WL 1664074, at *3 (M.D. Ala. June 15, 2009) (recommendation of the magistrate judge). The alternative to not signing a living agreement could mean segregation from the prison population. *See id*.

6

no evidence was submitted. The court granted Mr. Williams additional time to supplement the record. (*See* Doc. # 43.) Mr. Williams responded by submitting his affidavit. (Doc. # 44.)

## IV. DISCUSSION

### A. <u>Official Capacity Claims</u>

Mr. Jackson asserts that any claim against him in his official capacity is barred by the Eleventh Amendment. (Doc. # 38, at 5.) Mr. Williams concedes this point, (Doc. # 41, at ¶ 1), and therefore, Mr. Williams's deliberate indifference claim against Mr. Jackson in his official capacity is due to be dismissed.

### B. <u>Individual Capacity Claims</u>

As for the individual capacity deliberate indifference claim, Mr. Jackson argues that he is entitled to summary judgment because of (1) qualified immunity doctrine, and (2) Mr. Williams's failure to meet his evidentiary burden at summary judgment.

#### 1. *Qualified Immunity*

The doctrine of "[q]ualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *McCullough v. Antolini*, 559 F.3d 1201, 1205 (11th Cir. 2009) (internal quotation marks omitted). Qualified immunity

exists to allow officials to carry out their duties without worrying about personal liability or subjection to lawsuits. *Id.* To be entitled to qualified immunity, an official must first establish that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Id.* (internal quotation marks omitted). Here, there is no dispute that Mr. Jackson was exercising his discretionary authority while roving the C dorm. Thus, to defeat the qualified immunity defense, the onus is on Mr. Williams to show that Mr. Jackson violated his clearly established constitutional right. *See id.* (citing *Pearson v. Callahan*, 555 U.S. 223 (2009).

Mr. Williams's right to be free from prison officials' deliberate indifference to his safety was clearly established. "Prison officials have an obligation to protect prisoners from violence inflicted upon them by other prisoners," but "every injury suffered by one prisoner at the hands of another [does not] translate[] into constitutional liability for prison officials responsible for the victim's safety." *Harrison v. Culliver*, ___ F.3d ____, ____, 2014 WL 1304010, at *5 (11th Cir. 2014) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "Prison officials must 'take reasonable measures to guarantee the safety of the inmates.'" *Id.* (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). The Eighth Amendment is violated only when an officer is deliberately indifferent to "a

known, substantial risk of serious harm to an inmate." *Id.* (quoting *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1028 (11th Cir.2001) (en banc)).

Therefore, to succeed on a deliberate indifference claim, an inmate-plaintiff must first show "an objectively substantial risk of serious harm to prisoners." *Id.* (quoting *Marsh*, 268 F.3d at 1028–29). Then he must show that the prison official-defendant was subjectively aware of the risk and deliberately indifferent to it. *Id.*; *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995). And finally, he must show causation. *Hale*, 50 F.3d at 1582.

Addressing the theory that Mr. Jackson was deliberately indifferent when he allowed Mr. Williams to visit Mr. Bell's area of the C dorm, Mr. Jackson argues that Mr. Williams was under no threat until he entered the C4 dorm and approached Mr. Bell. Indeed, there is no allegation or evidence that Mr. Bell previously had threatened or hurt Mr. Williams.[4] With respect to the theory that Mr. Jackson was deliberately indifferent when he failed to intervene in the ruckus, Mr. Jackson contends that even if the allegation that he watched Mr. Bell attack Mr. Williams is adequate to support a deliberate indifference claim, the claim "is directly at odds with the evidence," including Mr. Jackson's affidavit and the inmates' statements to DOC investigators. (Doc. # 38, at 9 (citing Exs. A & C).)

---

[4] Assuming that Mr. Williams's affidavit version of events is accurate, *i.e.*, assuming that Mr. Bell "was permitted to come over to [Mr. Williams's] area," (Doc. # 44, at 1), the result is the same. These inmates had no history that could put Mr. Jackson on notice of a substantial risk to Mr. Williams's safety.

Therefore, Mr. Jackson asserts, that qualified immunity is appropriate because Mr. Williams cannot prove that he suffered a deprivation of his clearly established Eighth Amendment rights.

In response, Mr. Williams argues that his sworn testimony conflicts with Mr. Jackson's and creates a genuine dispute of material fact which precludes summary judgment on qualified immunity grounds. In his affidavit, Mr. Williams addresses the evidentiary import of his seemingly contradictory, prior statements to DOC investigators. There, he says, "I admit that I did meet with a state investigator [to] talk about this incident. When Officer Jackson came to the door of the room we were in, [Mr.] Bell did stop stabbing me. However, before that, and while I was being stabbed repeatedly, I could see Officer Jackson just standing outside the room looking through a glass window and watching [Mr.] Bell hurt me." (Doc. # 44.)

Viewing the evidence in the light most favorable to Mr. Williams, Mr. Williams's reported statement to an investigator regarding Mr. Jackson's conduct is not necessarily a contradiction of Mr. Williams's later affidavit testimony.[5] Mr. Williams's and Mr. Bell's indications that the "police" were watching at a point after the Mr. Williams had been stabbed, which prompted Mr. Bell to walk away,

---

[5] The location of the fracas in Mr. Williams's area of C dorm, per Mr. Williams's affidavit, is clearly inconsistent with the balance of the evidence. Nevertheless, this and other inconsistencies, sure to be explored at trial, are not material disputes here.

does not foreclose the possibility that Mr. Williams observed Mr. Jackson watching Mr. Bell attack him earlier. Further, the apparent purpose of the DOC investigation was not to learn about whether Mr. Jackson was deliberately indifferent or derelict in his duties, but to obtain information about Mr. Bell's criminal conduct against Mr. Williams. (*See* Doc. # 38-3, at 12 (where investigator discusses her intent to present the case to a grand jury in spite of Mr. Williams's decision not to press charges against Mr. Bell).) For these reasons, the motion for summary judgment on qualified immunity grounds is due to be denied.[6]

### 2.  *Failure to Meet Evidentiary Burden at Summary Judgment*

Alternatively, Mr. Jackson argues that "[Mr.] Williams will not be able to present admissible evidence to prove his claim that [Mr.] Jackson witnessed the altercation [and] failed to intervene." (Doc. # 38, at 10.) But, as discussed, Mr. Williams has presented his own sworn testimony as admissible evidence, thereby meeting his evidentiary obligation under Rule 56.

### V. CONCLUSION

In accordance with the foregoing analysis, it is ORDERED that the motion for summary judgment (Doc. # 38) is granted with respect to Mr. Williams's

---

[6] Mr. Williams also argues that his statements to DOC investigators are inadmissible because they are unsworn and the transcript of his conversation was not produced by a certified court reporter or otherwise authenticated. (*See* Doc. # 41, at 3–4.) Consideration of the merits of that argument is unnecessary in view of the finding that Mr. Williams's affidavit testimony regarding the conduct of Mr. Jackson does not necessarily contradict his prior statements.

official capacity claim against Mr. Jackson, but denied with respect to the individual capacity claim.

DONE this 12th day of May, 2014.

                                         /s/ W. Keith Watkins
                              CHIEF UNITED STATES DISTRICT JUDGE